IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WALKER MACY LLC and **XIAOYANG ZHU**,

                Plaintiffs,

        v.

**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES** and **LORI SCIALABBA**, Acting Director, U.S. Citizenship and Immigration Services,

                Defendants.

Case No. 3:16-cv-995-SI

**OPINION AND ORDER**

Brent W. Renison, PARRILLI RENISON LLC, 610 SW Broadway, Suite 505, Portland, OR 97205. Of Attorneys for Plaintiffs.

Benjamin C. Mizer, Principal Deputy Assistant Attorney General; William C. Peachey, Director; Glenn M. Girdharry, Assistant Director; and Joshua S. Press, Trial Attorney, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, District Court Section, P.O. Box 868, Ben Franklin Station, Washington, DC 20044. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

        Plaintiffs Walker Macy LLC ("Walker Macy") and Xiaoyang Zhu[1] bring this putative

class action against U.S. Citizenship and Immigration Services ("USCIS") and its Acting

---

[1] Plaintiffs Tenrec, Inc. and Sergii Sinienok voluntarily dismissed their claims.

Director, Lori Scialabba, in her official capacity.[2] Plaintiffs allege that USCIS improperly administers its H-1B specialty occupation nonimmigrant visa worker program in violation of federal law.[3] The parties cross-move for summary judgment. For the reasons discussed below, Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted.

## LEGAL STANDARDS

### A. Administrative Procedure Act

Plaintiffs bring their claims under the Administrative Procedure Act ("APA").[4] Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). A reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quotation marks and citation omitted). The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (quotation marks and citation omitted). Although a court's review is deferential, the court "must engage in a careful, searching review to

---

[2] Acting Director Lori Scialabba is hereby substituted for original defendant and former Director Leon Rodriguez.

[3] The H-1B program takes its name from 8 U.S.C. § 1101(a)(15)(H)(i)(b), which defines a class of nonimmigrant alien workers eligible to work in the United States temporarily to perform services in "specialty occupations." *See* 8 C.F.R. § 214.2(h)(1)(i) and (ii)(B) (noting that these visas are called "H-1B" and describing the H-1B classification).

[4] 5 U.S.C. §§ 701 *et seq*.

ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2007).

## B.  Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial,

PAGE 3 – OPINION AND ORDER

the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## C.  Principles of Statutory Interpretation

"The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute." *Robinson v. United States*, 586 F.3d 683, 686 (9th Cir. 2009) (quotation marks omitted). "When interpreting a statute, the court begins with the statutory text and interprets statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary." *I.R. ex rel. E.N. v. Los Angeles Unified Sch. Dist.*, 805 F.3d 1164, 1167 (9th Cir. 2015) (quotation marks omitted). The plain meaning of the statute controls, unless such a reading would result in unreasonable or impracticable results. *Robinson*, 586 F.3d at 687.

"'A statute is ambiguous if it gives rise to more than one reasonable interpretation.'" *Woods v. Carey*, 722 F.3d 1177, 1181 (9th Cir. 2013) (quoting *DeGeorge v. U.S. Dist. Ct. for Cent. Dist. of Cal.,* 219 F.3d 930, 939 (9th Cir. 2000)). "'The plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but also by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 135 S. Ct. 1074, 1081-82 (2015) (noting that courts cannot rely on dictionary definitions alone) (alterations in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). A court should "not [be] guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Dole v. United Steelworkers of*

*Am.*, 494 U.S. 26, 35 (1990) (quotation marks omitted). Moreover, "[i]t is a cardinal canon of statutory construction that statutes should be interpreted harmoniously with their dominant legislative purpose." *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1133 (9th Cir. 2010) (quoting *United States v. Gallenardo*, 579 F.3d 1076, 1085 (9th Cir. 2009)); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute."); *I.R.*, 805 F.3d at 1167 ("[W]e must read the words [of a statute] in their context and with a view to their place in the overall statutory scheme. Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." (quotation marks omitted; alterations in original)). In construing an ambiguous statute or term, a court may also look to legislative history to illuminate the intent of Congress. *See Woods*, 722 F.3d at 1181.

## BACKGROUND

### A.  H-1B Visa Program and Associated Legislative Actions

Employers in the United States may petition for a nonimmigrant work visa under the H-1B program when they seek to employ foreign workers in specialty occupations that require theoretical or practical application of a body of highly specialized knowledge, including but not limited to architecture, engineering, medicine, law, and other fields that require the attainment of a bachelor's degree or higher. 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1); 8 C.F.R. § 214.2(h)(4)(ii). To petition for an H-1B visa, the employer must submit a Form I-129, Petition for Nonimmigrant Worker. The employer also must file a Labor Condition Application that has been certified by the Department of Labor ("DOL"). *See* 8 C.F.R. § 214.2(h)(4)(i)(B)(1).

Congress has limited the number of H-1B visa petitions that may be granted in any given fiscal year (or "FY").[5] This is commonly referred to as the H-1B "cap." The current annual limit for H-1B visa petitions subject to the cap is 85,000. Of these, 65,000 visa petitions are subject to the "regular cap," with an exemption for the first 20,000 workers who have earned a master's or higher degree from a United States institution of higher education (the "master's cap"). *See* 8 U.S.C. § 1184(g).[6]

The H-1B visa is a temporary visa with a maximum duration of six years. *See* 8 U.S.C. § 1184(g)(4). It is designed so that U.S. companies can employ citizens of another country. This is in comparison to employer-sponsored "immigrant" visas, which allow persons to come and work in the United States as permanent residents.

"H" visas have existed since 1952. The Immigration Reform and Control Act of 1986 ("IRCA") subdivided the H visa category into: (1) H-1 visas for persons of "distinguished merit and ability," such as professionals, artists, athletes, entertainers, and prominent business people who lack professional credentials; (2) H-2A for temporary workers performing agricultural labor or services; (3) H-2B for temporary workers performing nonagricultural labor or services for which no U.S. workers could be found; and (4) H-3 for foreign trainees. Labor unions were concerned about the H-1 classification not having any requirement for determining the availability of qualified U.S. workers. Of particular concern were foreign nurses and entertainers, who constituted approximately half of all H-1 admissions.

---

[5] The federal government's fiscal year is the 12-month period ending on September 30th of that year, having begun on October 1st of the previous year. Thus, Fiscal Year 2017, or FY 2017, runs from October 1, 2016, through September 30, 2017.

[6] Some H-1B visa petitions are not subject to the Congressional limitation. These are known as "cap-exempt" petitions. In addition, some H-1B visas are set aside under legislation implementing certain free-trade agreements. Neither are relevant to this lawsuit.

Congress partially responded to these concerns with the Immigration Nursing Relief Act of 1989 ("INRA"), which placed foreign nurses into a new H-1A category for a five-year period, while other H-1 visa recipients were classified as H-1B. The INRA also required employers to attest that hiring foreign nurses would not adversely affect the wages and working conditions of U.S. nurses and that the foreign nurses would be paid at the same rate as U.S. nurses. The INRA program ended in 1997 and was replaced by 8 U.S.C. § 1101(a)(15)(H)(i)(c), but some of the provisions from the program now apply to other H visas.

In the Immigration Act of 1990 ("IMMACT"), Congress enacted major revisions to the Immigration and Nationality Act ("INA") for employment-based immigration. The IMMACT divided the H-1B visa category into several categories. Foreign nationals with "extraordinary ability" in the sciences, arts, education, business, or athletics were moved to a new "O" nonimmigrant visa category. Performing artists, entertainers, and internationally recognized athletes were moved to a new "P" category. This narrowed the applicability of H-1B visas to professionals. The IMMACT also added the requirement of an attestation regarding the pay of foreign workers and the effect on U.S. workers, similar to the INRA requirement for the hiring of foreign nurses. The IMMACT also capped the annual number of new cap-subject H-1B petition approvals to 65,000 per fiscal year. (As discussed further below, there were progressively increasing caps in the late 1990s and early 2000s, but from FY 2004 forward the cap of 65,000 applies).

Controversy continued relating to the H visas. In the American Competitiveness and Workforce Improvement Act of 1998, Congress added a fee required to sponsor H-1B workers, with funds going to scholarships to help U.S. workers close skills gaps. This law also temporarily increased the H-1B cap in FYs 1999-2001 because the cap was continuously being met, or

exhausted. This law also improved protections for both American and nonimmigrant workers, adding requirements for "H-1B dependent" employers and requiring additional attestations that U.S. employers will not displace American workers and that such employers unsuccessfully had attempted to recruit American workers. It also enhanced penalties for certain violations by employers.

In the American Competitiveness in the Twenty-First Century Act of 2000, Congress again temporarily increased the H-1B cap, for FYs 2001-2003. This law also exempted universities and nonprofit research institutions from the H-1B cap and increased the filing fee.

The H-1B Visa Reform Act of 2004 added the "master's cap" exemption, creating 20,000 additional H-1B visas for persons with master's degrees or higher. It also increased the fee charged to large companies, decreased the fee charged to smaller companies, and expanded the DOL's investigative authority over the required labor certifications.

The statutory cap has been met (or exhausted) before the end of each fiscal year since 1997, although only more recently has the cap been met during the first few days in which applications are accepted. Since December 1991, regulations have required that USCIS (and the Immigration and Naturalization Service ("INS") before it)[7] reject and return applications received after the numerical limit has been met. *See* Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 56 Fed. Reg. 61111 (Dec. 2. 1991) (codified at *former* 8 C.F.R. § 214.2(h)(8)(ii)(E) (Jan. 1, 1992)) ("If the total numbers available in a fiscal year are used, new petitions and the accompanying fee shall be rejected and returned

---

[7] INS used to be the relevant agency for H-1B visas. As of March 1, 2003, INS was eliminated as a government agency and most INS functions were transferred from the Department of Justice to three new components within the newly formed Department of Homeland Security. USCIS is one of those three components. U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection are the other two.

with a notice that numbers are unavailable for the particular nonimmigrant classification until the beginning of the next fiscal year."). None of the legislative changes made after 1991 altered this procedure of rejecting and returning petitions filed after the statutory cap had been met.

After the temporary cap increases expired (in FY 2004 and thereafter), the H-1B annual caps began getting reached earlier and earlier. In 2005, USCIS adopted rules changing its procedures for accepting and processing H-1B petitions. Among other things, the new rules authorized, if needed, the use of a random computer selection process. *See* Allocation of Additional H-1B Visas Created by the H-1B Visa Reform Act of 2004, 70 Fed. Reg. 23775, 23778, 23783 (May 5, 2005) (codified at *former* 8 C.F.R. § 214.2(h)(8)(ii)(B) (Jan. 1, 2006)). Under these procedures, USCIS estimated the number of petitions it would need to fill the 85,000 slots, monitored the number of petitions received, and notified the public of the date that USCIS had received the necessary number of petitions (the "final receipt date"). Only applications received by the final receipt date were part of the random computer selection, unless the final receipt date was the very first day that applications could be received, in which case applications on both the first and second days were part of the random selection process. For FY 2007, this limit was reached in the first two months. For FY 2008 the limit was reached on the first day. After that experience, USCIS changed the regulation.

In 2008, H-1B processing procedures were changed with the adoption of new rules. *See* Petitions Filed on Behalf of H-1B Temporary Workers Subject to or Exempt from the Annual Numerical Limitation, 73 Fed. Reg. 15389 (Mar. 24, 2008) (codified at 8 C.F.R. § 214.2(h)(8)(ii)(B)). USCIS had found that stopping consideration of petitions received after the final receipt date caused employers to spend significant effort and money to send petitions by overnight delivery for receipt by USCIS on the first allowable date. *Id.* at 15,391. This also

caused problems for overnight delivery carriers and for USCIS offices receiving petitions. *Id.*
Thus, USCIS changed the procedure to include in the computer selection process all petitions
received within the first five business days. *Id.* at 15,392 ("This will eliminate filing problems
resulting from a rush of filings made on the first day on which employers may file petitions for
the upcoming fiscal year. USCIS has determined that a filing period of five business days is
sufficient to account for a wider range of mail delivery times offered by the various mail delivery
providers available to the public." (citation omitted)).

 In FY 2010 and 2011, applications decreased due to the recession, and it took longer to
reach the quota. In FY 2013, the limit was reached in the first week, and random selection was
used for all of the applications. For FY 2014 and after, the cap was reached in the first week.

 Congress has considered and rejected bills that would, among other things, eliminate the
random selection system. These include the "Immigration Driving Entrepreneurship in America
Act of 2011," the "Border Security, Economic Opportunity, and Immigration Modernization Act
of 2013," and the "Immigration Innovation Act of 2013." There have been additional bills
considered, although none made it out of committee. These included the "H-1B and L-1 Visa
Reform Act of 2015," "American Jobs First Act of 2015," "Protecting American Jobs Act," and
"Immigration Innovation Act of 2015." Although these bills eliminated random selection in
favor of prioritization based on other factors (*e.g.*, beneficiary's education, wage being offered),
none of them required that USCIS change its policy of rejecting *petitions* after the statutory cap
of *visas* is reached.

## B. Relevant Statutory and Regulatory Provisions

 Plaintiffs argue that in processing H-1B visa petitions, Defendants are violating
Congress's directive in 8 U.S.C. § 1184(g)(3). That provision states: "Aliens who are subject to
the numerical limitations of paragraph (1) shall be issued visas (or otherwise provided

nonimmigrant status) *in the order in which petitions are filed* for such visas or status." (emphasis

added). Specifically, Plaintiffs argue that Defendants' regulation establishing the procedures for

processing petitions is improper and invalid.

The challenged regulation provides:

> When necessary to ensure the fair and orderly allocation of numbers in a particular classification subject to a numerical limitation or the exemption under section 214(g)(5)(C) of the Act, USCIS may randomly select from among the petitions received on the final receipt date the remaining number of petitions deemed necessary to generate the numerical limit of approvals. This random selection will be made via computer-generated selection as validated by the Office of Immigration Statistics. Petitions subject to a numerical limitation not randomly selected or that were received after the final receipt date will be rejected. Petitions filed on behalf of aliens otherwise eligible for the exemption under section 214(g)(5)(C) of the Act not randomly selected or that were received after the final receipt date will be rejected if the numerical limitation under 214(g)(1) of the Act has been reached for that fiscal year. . . . If the final receipt date is any of the first five business days on which petitions subject to the applicable numerical limit may be received (*i.e.*, if the numerical limit is reached on any one of the first five business days that filings can be made), USCIS will randomly apply all of the numbers among the petitions received on any of those five business days, conducting the random selection among the petitions subject to the exemption under section 214(g)(5)(C) of the Act first.

8 C.F.R. § 214.2(h)(8)(ii)(B).

Additionally, both sides argue that various portions of 8 U.S.C. § 1153 relating to

immigrant visas supporting their respective positions. This statute provides, in relevant part:

> (e) Order of consideration
>
> (1) Immigrant visas made available under subsection (a) or (b) of this section shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General (or in the case of special immigrants under section 1101(a)(27)(D) of this title, with the Secretary of State) as provided in section 1154(a) of this title.
>
> (2) Immigrant visa numbers made available under subsection (c)

(relating to diversity immigrants) shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved.

(3) Waiting lists of applicants for visas under this section shall be maintained in accordance with regulations prescribed by the Secretary of State.

* * *

(g) Lists

For purposes of carrying out the Secretary's responsibilities in the orderly administration of this section, the Secretary of State may make reasonable estimates of the anticipated numbers of visas to be issued during any quarter of any fiscal year within each of the categories under subsections (a), (b), and (c) of this section and to rely upon such estimates in authorizing the issuance of visas. The Secretary of State shall terminate the registration of any alien who fails to apply for an immigrant visa within one year following notification to the alien of the availability of such visa, but the Secretary shall reinstate the registration of any such alien who establishes within 2 years following the date of notification of the availability of such visa that such failure to apply was due to circumstances beyond the alien's control.

## C.  Walker Macy's Petition

To petition for an H-1B visa for an employee to start the first day of a fiscal year, October 1, the earliest date that the petition can be filed is April 1 of the preceding fiscal year. 8 C.F.R. § 214.2(h)(9)(i)(B). Walker Macy filed a Form I-129 on April 1, 2016. Walker Macy did not receive a receipt notice for its petition because its petition was not among those randomly selected for processing.

## DISCUSSION

Plaintiffs bring their claims under the APA, alleging that Defendants are failing to process H-1B visa petitions in the manner required by Congress. Defendants' regulation, 8 C.F.R. § 214.2(h)(8)(ii)(B), permits a random computer-generated selection process for H-1B petitions and requires that petitions not processed within a given year's statutory cap be returned.

PAGE 12 – OPINION AND ORDER

Plaintiffs assert that this procedure conflicts with the unambiguous command of Congress in 8 U.S.C. § 1184(g)(3) that H-1B visas shall be issued "in the order in which petitions are filed."

Plaintiffs challenge two aspects of the procedure used by Defendants in processing H-1B visas. Plaintiffs first dispute the practice that Defendants reject and return petitions after enough petitions have been received to meet the statutory cap, instead of creating an ongoing waiting list and processing all petitions in order when the next visa opportunity becomes available, even if that means waiting until the next fiscal year. Plaintiffs also dispute the practice that Defendants use a random computer-generated random selection process, instead of processing all petitions in the order in which they are filed.

## A.  Failure to Implement a Waiting List

The Court reviews USCIS's (and before it, INS's) interpretation of the INA, a statute it is charged with administering, under the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the Court determines whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "the statute is *silent or ambiguous* with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843 (emphasis added). At this second step, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). As discussed below, Defendants' interpretation is entitled to deference and is reasonable; it is therefore upheld.

###### a. *Chevron* Step Zero

Before turning to *Chevron's* two-step process, a court should determine whether the agency interpretation at issue is one that may even be accorded *Chevron* deference. *See Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1086 n.3 (9th Cir. 2016). This is often referred to as *Chevron* "step zero." *Id.* "An 'administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Id.* (quoting *United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001)). Interpretations such as those "contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant *Chevron*-style deference." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000).

Here, Defendants' policy of rejecting and returning petitions after the statutory cap has been met originated in a 1991 rule. This rule provided: "If the total numbers available in a fiscal year are used, new petitions and the accompanying fee shall be rejected and returned with a notice that numbers are unavailable for the particular nonimmigrant classification until the beginning of the next fiscal year." *See former* 8 C.F.R. § 214.2(h)(8)(ii)(E) (Jan. 1, 1992). This was a final rule, completed after notice and comment, under the APA. Plaintiffs do not dispute that this rule is the type of regulation that may be accorded deference under *Chevron* and thus meets the requirements of *Chevron* step zero. Plaintiffs argue, however, that this rule should not be accorded deference because the statute is unambiguous in its requirement that a waiting list be implemented and because Defendants' interpretation leads to unreasonable results.

### b. *Chevron* Step One—Ambiguity or Silence

Looking at the text of § 1184(g)(3) and the INA as a whole, and using appropriate canons of statutory interpretation, the Court finds that the requirement in § 1184(g)(3) that H-1B petitions be processed "in the order in which petitions are filed" is ambiguous; it also is silent as to the aspects of Defendants' procedures that are at issue in this case.

### i. The term "filed" is ambiguous

That statute instructs that petitions are to be processed in the order "filed." Plaintiffs' arguments require "filed" to mean when a petition is submitted to, delivered to, or received by USCIS. But the statute does not use any of those terms. It states "filed."

The term "filed" is not defined in the statute or the relevant regulations. In other regulations promulgated under the INA, however, USCIS has interpreted the "filing date" of a petition to be "[t]he date the alien submits an application to a qualified designated entity, legalization office or overseas processing office." 8 C.F.R. § 210.2(b)(1); *see also* 8 C.F.R. § 245a.4(b)(6) ("The date the alien submits a completed application to a Service office or designated entity shall be considered the filing date of the application . . . .").

The fact that the date an application or petition is submitted has been interpreted by Defendants to be the "filing date" does not, however, define *how* petitions are "filed" on that date. "Filed" has more than one reasonable interpretation. It could mean when a petition is simply delivered to a USCIS office, along with a filing fee. It could also mean when a USCIS employee takes the petition and does something with it, such as log it into a computer system, assign it a processing number (including through a random computer-generated system), accepting the filing fee, or some other administrative task.

Looking at the dictionary definition of "file" supports that "file" can include either simple delivery or a requirement of some further administrative action to enter or record the delivered

document. There are numerous definitions for file, the two most relevant of which are: "to deliver (as a legal paper or instrument) after complying with any condition precedent (as the payment of a fee) to the proper officer for keeping on file or among the records of his office"; and "to place (as a paper or instrument) on file among the legal or official records of an office esp. by formally receiving, endorsing, *and entering*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 849 (unabridged ed. 2002) (emphasis added).

Additionally, because § 1184(g)(3) was passed by Congress in 1990 when there was not widespread public use of electronic submissions, it is logical that Congress anticipated H-1B petitions would be submitted either by U.S. mail or other carriers. Thus, it was reasonable to anticipate multiple petitions would arrive on the same day. It is therefore a reasonable interpretation of "filed" to include some further administrative step beyond mere receipt at a USCIS office to "order" multiple petitions that arrived in such a manner on the same day. Accordingly, the meaning of "filed" in § 1184(g)(3) is ambiguous.

### ii.  The statute is silent regarding waiting lists and excess petitions

Section 1184(g)(3) does not contain any provision relating to a waiting list or directing how petitions should be handled after the statutory cap on visas has been met. Plaintiffs argue that § 1184(c) allows unlimited petitions, and by rejecting petitions after the visa cap is met, Defendants' procedures for processing H-1B petitions do not properly understand the distinction within the statutory framework between a petition for a visa and the issuance of the visa itself. Plaintiffs emphasize these differences because Plaintiffs argue that the number of *visas* is effectively capped at 85,000 per year in the statute, but the number of *petitions* for a visa is not capped.

Section 1184(c), the provision governing petitions, does not contain a numerical cap. The numerical cap is in § 1184(g). The numerical limitation in this section applies only to the "total

number of aliens who may be issued visas or otherwise provided nonimmigrant status during any fiscal year." § 1184(g)(1). This provision does not address the number of employer-sponsored petitions. Thus, Plaintiffs argue, had Congress intended to limit *petitions*, it would have inserted a similar limit into § 1184(c). Thus, Plaintiffs conclude, USCIS's rejection and return of *petitions* after the visa numerical cap is reached is not supported in the statute.

Plaintiffs further contend that the statutory text unambiguously requires that: (1) only a limited number of visas may be granted in a fiscal year; (2) there is no limit to the number of petitions that may be filed in a fiscal year; and (3) the visas must be issued in the order in which petitions are filed. From this, Plaintiffs conclude that the only reasonable interpretation is that petitions must be accepted even after the fiscal year visa cap is met and a waiting list must be instituted so that approvals can be done and visas issued in the order in which petitions are filed.

Plaintiffs' argument overlooks the fact that in § 1184 Congress is silent with respect to how to handle petitions after the statutory cap has been met and whether a waiting list should be used. This is in contrast to § 1153(e)(3), which provides for a waiting list, and § 1153(g), which discusses waiting list procedures.

The Ninth Circuit recently discussed the effect of a statute's silence on an issue:

> [T]here is a distinction between court decisions that interpret statutory commands and court decisions that interpret statutory silence. Moreover, *Chevron* itself distinguishes between statutes that directly address the precise question at issue and those for which the statute is "silent." As such, if a court holds that a statute unambiguously protects or prohibits certain conduct, the court "leaves no room for agency discretion" under *Brand X*, 545 U.S. at 982. However, if a court holds that a statute does not prohibit conduct because it is silent, the court's ruling leaves room for agency discretion under *Christensen*.

*Perez*, 816 F.3d 1088 (citations omitted). Section 1184(g) neither prohibits nor mandates a waiting list; it is silent on that issue. Thus, it leaves room for agency discretion.

PAGE 17 – OPINION AND ORDER

### iii. Differences in statutory text

Plaintiffs note that before the IMMACT, there was no numerical limit on H visas. Plaintiffs describe that the immigrant visa category that had numerical limitations during this time, however, was governed by statutory text stating that visas would be issued "in the order in which a petition in [*sic*] behalf of each such immigrant is filed." *see former* 8 U.S.C. § 1153(b). Those visas were processed with a priority date and waiting list. Therefore, argue Plaintiffs, when Congress created numerical limits on H visas in the IMMACT in 1990 and used nearly identical text to instruct the agencies on how to issue visas, Congress intended that those visas be processed in the same manner—with priority dates and waiting lists.

Plaintiffs further note that within the IMMACT, Congress also added a new category of visa, "Diversity Immigrant" visas, with a numerical limitation. Here, however, Congress provided that immigrant visa numbers for this category shall be issued "strictly in a random order." 8 U.S.C. § 1153(e)(2). Thus, argue Plaintiffs, when Congress intended for the processing of petitions to be random it said so. It did not include such text for the H-1B visa, but instead used the same verbiage used for visas that had historically had waiting lists and priority dates.

These arguments overlook two critical aspects of comparing §§ 1184 and 1153. First, Plaintiffs are correct that both § 1184(g)(3) and 1153(e)(1) require visa petitions be processed "in the order" in which they are filed. In § 1153(e), however, Congress added an express provision that "[w]aiting lists of applicants for visas under this section shall be maintained in accordance with regulations prescribed by the Secretary of State." 8 U.S.C. § 1153(e)(3). Further guidance on the procedures for the waiting lists is provided in § 1153(g). No such similar provisions are contain in § 1184. The Court should give meaning to the fact that Congress expressly included waiting list provisions in § 1153 but did not include such provisions in § 1184. *See Nat'l Fed'n of Indep. Business v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain

language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.”); *Russello v. United States*, 464 U.S. 16, 23 (1983) (“[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.”); *Higley v. Flagstar Bank, FSB*, 910 F. Supp. 2d 1249, 1259 (D. Or. 2012) (“Under the doctrine of *expressio unius est exclusio alterius*, the absence of [a] term . . . is telling.”).

Second, Plaintiffs’ argument that the use in § 1184(g) of “in the order in which petitions are filed,” instead of “strictly in a random order” as is used in § 1153(e)(2), demonstrates that a waiting list must be used ignores the fact that the waiting list provisions in §§ 1153(e)(3) and (g) may apply to petitions that are processed in “strictly in a random order” under § 1153(e)(2). Both §§ 1153(e)(3) and (g) reference the two categories of visas governed by § 1153(e)(1) (requiring petitions be processed “in the order” filed) and the one category of visas governed by § 1153(e)(2) (requiring petitions be processed “in a random order”). Thus, when Congress intended a waiting list, it was not focused on whether the processing was random or in order. To ensure a waiting list, Congress drafted separate and specific provisions. Such provisions, however, are not found in § 1184.

### iv.  The statute is silent regarding simultaneous submissions

There is also silence in § 1184(g)(3) with regard to what to do with simultaneous submissions. Plaintiffs argue that the degree of simultaneous submissions is a result of Defendants’ deadlines and petition processing procedure. Although the high volume of petitions received within a few days of April 1st may be attributed to Defendants’ procedures, even if petitions were processed every day of the year there would be multiple petitions received each

day. There are 365 days in a year and 85,000 available visas. Thus, there will necessarily be simultaneous submissions.

The relevant question is whether the statute unambiguously directs how to handle multiple submissions received on the same day or at the same time. The statute does not. It provides no guidance on how to "order" simultaneous submissions.

### v.   Conclusion

The Court finds that § 1184(g)(3) does not unambiguously require a waiting list for H-1B petitions remaining or submitted after the statutory cap has been met. Accordingly, Defendants' interpretation is entitled to deference and must be upheld unless it is unreasonable.

### c.   *Chevron* **Step Two—Reasonableness**

Plaintiffs argue that Defendants' interpretation of the H-1B statute and resulting regulatory scheme is unreasonable and leads to arbitrary results. Plaintiffs note that an employer can petition for a foreign worker for many years and never obtain a visa, while another employer can petition for the first time and, due to randomness or luck, obtain a visa. Similarly, a specific foreign worker can be the beneficiary of petitions filed year after year and not yet obtain a visa, whereas another foreign worker can be the beneficiary of a later-filed petition and obtain a visa. Plaintiffs argue that this is not issuing visas in the order in which petitions are filed. Plaintiffs also note that large employers can "game" the system to get more opportunities to obtain an H-1B visa, such as by applying on behalf of multiple positions in related entities for the same worker.

Plaintiffs further argue that Defendants are creating their own problems. Plaintiffs assert that the reason hundreds of thousands of applications are received all at once is because Defendants require that all petitions be filed within a five-day window. If Defendants accepted petitions throughout the year, Plaintiffs contend, there would not be such a rush, or bunching

PAGE 20 – OPINION AND ORDER

effect. Plaintiffs also argue that the Defendants' assertion that there would be a "never ending" waiting list ignores the fact that employers would be able to make informed and educated decisions about whether to file a petition, knowing the size of the waiting list, as compared to the current process, which is arbitrary and random. Plaintiffs contend that it is Defendants' system that has caused a "de facto" arbitrary and never-ending waiting list for those who apply year after year, never get selected in the lottery, and have no way to get "in line."

Plaintiffs identify several nonimmigrant and immigrant visas that are processed using waiting lists. Plaintiffs argue these examples demonstrate that visas can successfully be managed using waiting lists. Plaintiffs assert that a waiting list would provide a more fair and orderly administration of H-1B petitions.

Defendants respond that a waiting list would create administrative difficulties. Defendants note that the purpose of H-1B visas is to facilitate urgent, short-term employment for needed highly skilled workers and the employer or the employee may no longer want the H-1B visa by the time the petition reaches the top of the waiting list. Defendants also point out that the DOL certifications would become stale if petitions were put on a waiting list that could take years to be processed. Defendants argue that H-1B temporary, nonimmigrant visas are different than the immigrant visas that are processed with waiting lists because those applicants are seeking permanent residence, not temporary work. Defendants also distinguish the nonimmigrant visas identified by Plaintiffs that use a waiting list. Defendants point out that those visas are for victims of crime that assist law enforcement and victims of human trafficking, and involve different reasoning behind the creation of a waiting list. Defendants also argue that the purpose of the INA is to protect American workers, and thus Plaintiffs' concern with protecting nonimmigrant workers is misplaced.

The reasonableness of Defendants' interpretation is supported by the fact that Congress chose not to include any waiting list provisions in § 1184, while Congress did include such provisions in § 1153. As discussed in analyzing *Chevron* step one, the difference in this statutory text has meaning. If Congress believed that is was inherently unreasonable not to implement a waiting list, Congress presumably would have included a waiting list provision in § 1184, as it did in § 1153.

The reasonableness of Defendants' interpretation is also demonstrated by Congress's implicit ratification of, or legislative acquiescence in, Defendants' policy of rejecting and returning of H-1B petitions. When amendments are enacted after an agency interpretation and those amendments are consistent with the agency's interpretation, this supports the reasonableness of the agency interpretation and is considered an implicit ratification. *See Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 942 (9th Cir. 2008) (finding amendments enacted after the IRS published its procedures "suggests that Congress implicitly ratified" the procedures, and concluding that the agency's procedures were reasonable); *see also Bob Jones*, 461 U.S. at 600-01 (finding non-action by Congress to be an implicit ratification of an agency interpretation where Congress had repeatedly considered, but declined to overturn, the agency interpretation). Additionally, when Congress is silent about a particular agency (or judicial) interpretation for a long period of time after that interpretation while repeated amendments have been passed, this demonstrates legislative acquiescence to the interpretation. *See Reyes-Torres v. Holder*, 645 F.3d 1073, 1080 (9th Cir. 2011) ("Significantly, Congress's silence on the propriety of the removal bar, despite repeated amendments to the INA, demonstrates legislative acquiescence to the Attorney General's authority to enact a departure regulation. Because Congress has acquiesced to the Attorney General's authority to limit an

alien's right to file a motion to reopen, and given that the Board's interpretation of that limitation

is reasonable, we should defer to the Board." (citing *Zhang v. Holder*, 617 F.3d 650, 662 (2d

Cir. 2010) ("Congress, through decades of silence on this subject despite repeated amendments

to the INA, has acquiesced in the BIA's understanding of the authority granted to it by the

Attorney General.")).

       Although courts generally "are slow to attribute significance to the failure of Congress to

act on particular legislation," that is not the case here. *Bob Jones*, 461 U.S. at 600. INS issued its

final rule declining to implement a waiting list and instead rejecting and returning petitions

in 1991. Since that time, Congress has repeatedly amended the INA. In not one of those

amendments did Congress add a provision requiring a waiting list. Congress also has repeatedly

considered, although not acted upon, additional amendments to the H-1B provision, again none

of which involve requiring a waiting list. This is not a situation of Congress remaining

completely silent in the face of administrative interpretation, in which the Supreme Court noted

"we walk on quicksand when we try to find in the absence of corrective legislation a controlling

legal principle." *Helvering v. Hallock,* 309 U.S. 106, 121 (1940); *see also Texas Dep't of Hous.*

*& Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2539-40 (2015)

(Thomas, J., dissenting). Instead, Congress has passed corrective and supplemental legislation—

including legislation affecting H-1B visas—but has declined to "correct" this particular

interpretation by USCIS. Under these circumstances, the Court finds that Congress has implicitly

ratified and legislatively acquiesced to USCIS's interpretation that § 1184(g)(3) does not require

a waiting list. *See Reyes-Torres*, 645 F.3d at 1080; *Tualatin Valley*, 522 F.3d at 942. This further

demonstrates the reasonableness of Defendants' interpretation.

Given the significant deference owed to an agency's interpretation when a statute is silent or ambiguous, the Court does not find that Defendants' refusal to implement a waiting list in the H-1B visa context is unreasonable. Although there may be good reasons to implement a waiting list, and it may align with the statutory purpose and text, so does Defendants' interpretation. Thus, it must be upheld. *See Hawaii v. FEMA*, 294 F.3d 1152, 1159 (9th Cir. 2002) ("If the agency's interpretation is a reasonable one, then it prevails whether or not there is another interpretation consistent—even more consistent—with the statute.").

**B. Random Computer-Generated Selections**

Plaintiffs also argue that the random computer-generated selection process permitted in 8 C.F.R. § 214.2(h)(8)(ii)(B) violates the requirement in § 1184(g)(3) that petitions be processed "in the order" in which they are filed. Plaintiffs note that § 1184(g) does not contain any provision allowing for random processing, in contrast to § 1153(e)(2), which provides that those visas shall be issued "strictly in a random order." Plaintiffs argue that this process is arbitrary and unfair because it may result in some persons never receiving a visa while other persons may receive a visa in the first year for which a petition on their behalf is filed.

The parties dispute whether 8 C.F.R. § 214.2(h)(8)(ii)(B) is entitled to *Chevron* deference because it is only an "interim" rule. Although it was promulgated under the APA after a notice and comment period, it was never finalized. Further, any comments received have not been publicly addressed. Thus, Plaintiffs argue, this interim rule is entitled only to lesser deference, as provided in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). The Court need not reach whether *Skidmore* or *Chevron* deference is appropriate because even under the lesser deference of *Skidmore*, Defendants' interpretation is upheld. *See, e.g.*, *Navarro v. Encino Motorcars, LLC*, 845 F.3d 925, 929 (9th Cir. 2017) (declining to resolve dispute about the appropriate level

of deference because "the answer does not affect the outcome" and thus assuming without

deciding that the lesser level of deference is warranted).

Under *Skidmore*, "an agency's interpretation may merit some deference whatever its

form, given the 'specialized experience and broader investigations and information' available to

the agency, and given the value of uniformity in its administrative and judicial understandings of

what a national law requires." *Mead*, 533 U.S. at 234 (quoting *Skidmore*, 323 U.S. at 139-40).

"Under this level of review, [courts] look to the process the agency used to arrive at its decision.

Among the factors [courts] consider are the interpretation's thoroughness, rational validity,

consistency with prior and subsequent pronouncements, the logic and expertness of an agency

decision, the care used in reaching the decision, as well as the formality of the process used."

*Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008) (citations, quotation marks, and brackets

omitted).

### 1. 2005 Rule

In the 1990s, the number of H-1B petitions began exceeding the statutory cap. Congress

temporarily increased the statutory cap. This temporary increase expired in 2004. Thus, in 2005,

USCIS for the first time promulgated the interim rule allowing a random computer-generated

selection process, if necessary. In promulgating this rule, USCIS discussed in detail the 2004

legislative amendment to the INA, the procedures for petitioning for FY 2005 additional H1-B

visas allowed by that amendment, and the procedures for petitioning for FY 2006 and beyond.

USCIS also discussed at length the challenges it faced in the past estimating when the statutory

cap will be met and with monitoring H-1B petitions. USCIS noted that it was implementing a

new system that allowed it to monitor petitions daily, but that it still faced the challenge of

estimating the number of petitions needed to meet the statutory cap.

Under the new system, USCIS would assign numbers to petitions in order, until the "final receipt date," which is the date the number of petitions necessary to meet the statutory cap would be met. *See former* 8 C.F.R. § 214.2(h)(8)(ii)(B) (Jan. 1, 2006) ("When calculating the numerical limitations for a given fiscal year, USCIS will make numbers available to petitions in the order in which the petitions are filed."). USCIS would monitor the number of petitions daily and then:

> When necessary to ensure the fair and orderly allocation of numbers in a particular classification subject to numerical limits, USCIS may randomly select *from among the petitions received on the final receipt date the remaining number of petitions* deemed necessary to generate the numerical limit of approvals.

*Id.* (emphasis added). Thus, the new system would randomly select only from the petitions received on the final receipt date,[8] and only for the slots remaining as of the final receipt date. Petitions filed before the final receipt date were given numbers in the order received. Petitions on the final receipt date not randomly selected, and petitions filed after the final receipt date, would be rejected and returned.

Considering the *Skidmore* factors, this rule is entitled to deference. USCIS thoroughly considered the problem of processing petitions under the assumption that more petitions will be received than needed to meet the statutory cap. In promulgating the rule, USCIS gave a detailed explanation of the background, the current procedures, and the new procedures. There was a formality to the process because the rule was promulgated with an explanation and sought comment. Although the rule was never finalized, the process was more formal than what occurs when an agency simply issues an internal policy document.

---

[8] The rule added: "If the final receipt date is the same as the first date on which petitions subject to the applicable cap may be filed (*i.e.*, if the cap is reached on the first day filings can be made), USCIS will randomly apply all of the numbers among the petitions filed on the final receipt date and the following day." *Former* 8 C.F.R. § 214.2(h)(8)(ii)(B).

The rule also is rational, logical, and based on the expertise of USCIS after fifteen years of processing H-1B petitions. Adding a random computer selection on the final receipt date to eliminate concerns of arbitrariness in delivery times and simultaneous delivery is not unreasonable or contrary to the statute, given the realities of common carrier delivery methods.[9]

It is worth noting that regardless of the random computer-generated selection process, there is always an element of randomness and arbitrariness to "ordering" petitions received from carriers such as U.S. Mail, Fed Ex Corporation ("Fed Ex"), and United Parcel Service, Inc. ("UPS"). When multiple petitions are all delivered at the same time, a USCIS employee will have to randomly select envelopes to open and process. The fact that these petitions are randomly ordered by a person is not challenged. That is understandable because until the statutory cap is met all of these petitions get processed, and thus there is no "harm" to the arbitrariness of randomly choosing envelopes out of a stack. Additionally, the agency must have some way of processing petitions out of hundreds or even thousands of envelopes that are delivered on the same day. But it is a reasonable interpretation that those petitions are not "filed" for purposes of § 1184(g) until after the USCIS employee has taken them out of the envelope and assigned them a number in order to get processed.

When the number of petitions needed to meet the statutory cap is reached, USCIS implements the random computer selection. This is the process that Plaintiffs challenge. But the

---

[9] The parties did not provide specific evidence as to whether USCIS accepts electronic filing of H-1B petitions. From the evidence in the record, however, it does not appear that electronic filing is accepted. In promulgating the 2005 rule, USCIS noted that it was "temporarily" suspending electronic filing. In promulgating the 2008 rule, USCIS discussed the problems and burden on overnight delivery services, without any discussion of electronic filing as an option to reduce that burden or "order" petitions filed on the same day (for example, through an electronic time stamp). Plaintiffs also note that USCIS issued a Notice of Proposed Rulemaking in 2011 that proposed an electronic registration system and waitlist. ECF 33 at 14 (citing 76 Fed. Reg. 11686 (Mar. 3, 2011)). The background section of this Notice discusses the current system as involving "mailing" petitions. 76 Fed. Reg. at 11687-88.

date on which the number of petitions needed to meet the statutory cap is met actually triggers even more concern with the arbitrariness and unfairness in the *human* selection of choosing envelopes to open and process.

It is not difficult to envision a scenario where many more petitions arrive on the final receipt date than are needed to fill the statutory cap, and processing them "in order" as Plaintiffs argue may also be random and arbitrary. For example, the Fed Ex driver may have had a flat tire or took a long lunch, resulting in the UPS truck delivering its petitions before Fed Ex. The U.S. Mail delivery may always be delivered in the afternoon for a particular location on the mail route, making its delivery last. Is it fair to process the UPS petitions first, simply because they "arrived" at the USCIS office first? And what if UPS delivers 3,000 petitions and only 500 are needed? How does the USCIS employee choose which 500 of the simultaneously-delivered 3,000 petitions get processed? Also, why should petitions sent by Fed Ex or U.S. Mail summarily be rejected and returned, even though they arrived on the same day (and thus have the same "filing date") as the petitions delivered by UPS? USCIS's decision to take all petitions received on the final receipt date and randomly select from them to fill the statutory cap is no less arbitrary than taking the petitions (or a portion of the petitions) that by chance were sent by the carrier that just happened to deliver them first on a particular day.

Moreover, § 1184(g)(3) does not provide that petitions must be processed in the order "received," "submitted," or "delivered." Instead, they must be processed in the order "filed." What it means to "file" a petition and how to handle simultaneously-received petitions are ambiguous and were not dictated by Congress in the INA. It is not an unreasonable interpretation by USCIS to conclude that when multiple petitions are received simultaneously on the day when the statutory cap is met, all of those petitions are not considered "filed" merely because they

were delivered. Thus, USCIS can randomly prioritize those petitions through a computer-generated system and only "file" the petitions that have been selected. The remaining petitions are not "filed," but are instead returned, along with the filing fee. Because the rejected petitions are not filed, they need not be "ordered" under § 1184(g)(3). Thus, the random selection occurs before filing and does not violate the statute.

The 2005 rule also is consistent with USCIS's previous and subsequent pronouncements. In previous pronouncements, USCIS (and INS before it) had pronounced that petitions in excess of those needed to meet the statutory cap would be rejected and returned, and the 2005 rule also contains that requirement. The addition of the random selection on the final day is a reasonable extension of the decision not to implement a waiting list. It provides a manner to select what petitions received on the final day will be "filed" and thus made part of the "order" to receive H-1B visas. The petitions that are rejected are returned as unfiled.

Thus, the 2005 rule adding a random selection process on the final receipt date is entitled to deference under *Skidmore*. It is a reasonable and rational interpretation of USCIS's obligations under the INA to resolve the issues of processing H-1B petitions in years when more petitions are filed than are needed to meet the statutory cap.

### 2. 2008 Rule

In 2008, USCIS promulgated a new interim rule. *See* 73 Fed. Reg. 15389 (Mar. 24, 2008) (codified at 8 C.F.R. § 214.2(h)(8)(ii)(B)). USCIS discovered that its previous procedure had resulted in employers spending significant effort and money to send petitions by expedited overnight delivery for receipt on the first day petitions would be allowed, resulting in more than 150,000 petitions being delivered on the same day and burdening employers, delivery services, and USCIS offices. *Id.* at 15390-91. Consequently, USCIS changed its procedures. Among other changes, USCIS expanded the random computer-generated selection process from

PAGE 29 – OPINION AND ORDER

only those applications received on the final receipt date (and the following day, if the final receipt date was the first day that applications could be received) to all applications received during the first five business days, if the number needed to meet the statutory cap was met in those five days. *Id.* at 15392. This was done specifically to alleviate the burden on employers, common carriers, and USCIS offices by allowing for more delivery methods than expedited overnight delivery. For the same reasons that the 2005 rule is entitled to deference and is upheld, this rule also is entitled to deference and is upheld.

The Court recognizes that the practical implication of this rule is that every petition will be subject to the random computer-generated selection process in years when the numbers of petitions needed to meet the statutory cap are met in the first five days. Because it is a reasonable interpretation of the statute that the only petitions that are "filed" are those that have been selected through the random computer process and the rejected and returned petitions thus are not filed at all, this process does not violate the statute.

Further, as discussed above, because Congress left to the discretion of USCIS how to handle simultaneous submissions, even if petitions are considered "filed" immediately upon delivery, USCIS has discretion to decide how best to order those petitions. Plaintiffs offer no suggestion of how to order 150,000 petitions being delivered on the same day that is less arbitrary than a random computer selection. If a carrier delivers bags of envelopes containing petitions, it is just as arbitrary to order them based on how the envelopes are removed from the delivery bag as it is to randomly select the petitions from a computer.

Plaintiffs' argument relies on the requirement that a waiting list must be implemented. Earlier in this Opinion and Order, however, the Court upheld USCIS's decision not to do so. The

agency used its expertise and experience to implement changes to procedures. The agency's actions were logical and address the problems created by the significant demand for H-1B visas.

## CONCLUSION

Plaintiffs' motion for summary judgment (ECF 31) is DENIED. Defendants' motion for summary judgment (ECF 32) is GRANTED.

**IT IS SO ORDERED**.

DATED this 17th day of March, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge